We move to the third case this morning, Runkel v. City of Springfield. Mr. Ron, are you with us? Yes. Sorry, your honor. Thank you. All right, Mr. Baker, you may proceed. Mr. Baker, we can't hear you. Oh, I'm so sorry. I pushed the wrong button. My apologies. All right. I don't know what you, Mr. Baker, none of us have ever done that. Well, I do apologize. I must say that the technology is, I'm not great with it. So please accept my apologies for that. Well, maybe we will. All right. You may proceed. All right. Thank you, your honor. May it please the court. My name is John Baker and I represent the appellant Diane Runkel. Now, Diane Runkel spent many years working for the City of Springfield, Illinois, and she worked for most of those years in the city's purchasing department, promoting up through the rank of the assistant purchasing manager. In 2018, her boss, the purchasing agent, left. He left the city and that created a vacancy. It was a position that Diane wanted, expressed her interest in. Undoubtedly, she was qualified for the position. She expressed her interest in the position, but the mayor of the City of Springfield decided differently. We brought this case alleging that she was discriminated against on the basis of her race. Diane is Caucasian. The individual who received the position is African-American. The district court, in our view, improperly disagreed with that conclusion that there was a race-based animus. Now, throughout our proceedings, we have alleged that we can state a claim under either the burden-shifting method of McDonnell Douglas or just through direct evidence. And we've presented a number of points that we believe would allow a jury, again, not mandate or compel a jury, but allow a jury to conclude that race was a motivating factor in this case. Now, the first is the procedure that was used to fill this position. And this is akin to the case of Rudin versus Lincoln Land. And what happened here was the city code, the municipal code, specifies that it is the manager of the office and budget who makes the decision who is going to get the job subject to the approval of the mayor and the advice and Mr. Baker, can I ask you, can I ask you to focus on what the mayor knew at the time the mayor made the decision? I understand the arguments regarding the, I understand these arguments regarding the OMB director and who makes the decision, but the mayor hires the OMB director. I mean, so that just seems to me to be a formality, but a bigger question may be what the mayor knew about the particular candidates at the time the mayor made the decision. You make an interesting argument on page 39 of your brief that some of the city's justifications may be manufactured after the fact. And I'd like you to expand on that and talk about did the mayor know enough at the time he made the decision to hire Ms. Wilkin? Well, it's unclear exactly what the mayor knew. We, you know, the mayor himself testified in his deposition that he thought Cassandra, Ms. Wilkin would be a good applicant for the position. He thought that she would, she would be good. Now, this is after he had previously offered it to another black person who had turned it down. He didn't conduct an interview. He knew that Diane Runkle was interested in the position. But he also, but he also knew that Ms. Wilkin, he knew that Ms. Wilkin was with City Water and Light and Power in the consolidate both billing departments. Is that enough? No. I mean, there's, there's, because there's, there's, first of all, he knew nothing about Diane Runkle. Now, if he had sat down. What difference, what difference does that make though? He certainly doesn't. I mean, look, if, if I had to make decisions on hiring law clerks and I had to look at every resume I received, that all I would do all year long is, is look at resumes for law clerks. I mean, why does the mayor have to compare any, you see what I'm saying? Why does he have to look at all the applicants if he believes one is qualified? Well, your honor, a couple of, a couple of things. Number one, the, the, the city code itself does say that he needs to look at the qualifications, that the budget director needs to look at the qualifications. So that's one reason why he has to look at that. But does it say he has to compare the qualifications of all applicants? I mean, I understand looking at qualified applicants, you want to hire a qualified applicant, right? So the city council would require him to look at the qualifications of the applicant. So he can't hire his neighbor who is totally unqualified for the position. But once he identifies a candidate and identifies that, that candidate's qualifications and says, this is enough, this is who I have to hire. What requires him to consider other candidates? Well, he was aware that Diane Runkle was interested in the position. And if the argument is, the city was making, hey, look, he just picked it out of a hat. He randomly selected or he selected somebody we thought was qualified. But the reality is their, their argument all along has been, well, no, no, Cassandra Wilkin was more qualified than Diane Runkle. That's the argument that they have made. And so that becomes problematic, particularly when you start to look at the I don't think anybody's arguing here that Ms. Wilkin is not qualified. I thought your point was that the city's formal response to the charge was that there was a comparison done. When in fact that when you've got evidence that that has to be protectual because the mayor didn't purport to do such a comparison. That's correct. When the, you know, when you look at the answer that was provided to the EEOC, it's and even in the brief to the city, they even in the city's brief to this case, they say that they have a good reason. And that is that Ms. Wilkin was more qualified. And that's just, you know, that that's, that's not true to begin with. But even if it were true, that was not something that was considered by the mayor at the time. He didn't go through Mr. Baker. Yes. Could I, could I raise with you another issue looking down the road in this case that concerns me and that's whether the position of purchasing agent is actually an employee under title seven. I know this is not directly before us, but I'm the, the, the arguments in the brief have a distinctly political feel to them about what was happening with this choice. Um, the district judge seems to have relied on the Trinello and Anderson cases out of the second and 10th circuits, uh, to hold at an earlier stage of the case that, uh, at least the claim is stated here. But I, in those cases, I don't see anything like this situation where by law, the, um, the, the appointment cannot take effect without permission of the elected officials in the, in the city, the mayor and the city council. But judge Hampton, I, I, I, this was an issue that was raised in a motion to dismiss. It was raised again in the summary judgment briefing. We addressed it. The district court denied the motion to dismiss and didn't address it in the summary judgment briefing. The city has not raised it before the court right now. So I don't think it's proper for this court to consider that issue at this particular point in time, the city could have raised as an alternative. Probably right. But I, I just given all of the discussion about how important your theory is, in essence, this was a political decision, right? Yeah. And, and because that has implications longer term for the case, that's, that's all I want to raise. And I'll stop there. Well, and, and, and, and judge Hamilton did that, that might be the case. I think we, we did raise that argument and we briefed that thoroughly. And I, as far as the cases that were cited by the district court in response to the motion to dismiss, I, I, I can't recall all that in great detail because that's not an issue before the court today, but I know it's stressful enough to argue the cases that are the issues that are actually before us for, for everybody. So, well, it is, and I, I do notice I'm getting into my rebuttal time. And so if there's any specific questions, I'd be happy to answer those, or I will reserve for my rebuttal. Thank you, counsel. Thank you. Mr. Rahn? Hey, please, the court. My name is Steve Rahn and with my co-counsel, Robert Hogue, we have the privilege of representing the city of Springfield and Mayor Jim Langfelder. As was pointed out earlier, the purchase, the position of the purchasing agent in the city of Springfield has long been considered a political appointment. The district court ruled against that position that it didn't meet the narrow definition and we did not pursue it further. It does have significance in the fact of whether or not Ms. Runkle was actually rejected for any position. Mr. Mr. Rahn, can I ask you to address Judge Hamilton's question, or Judge Hamilton's point that he made? The question, the question for a jury here would not be who's more qualified, whether Wilkin or Runkle was more qualified. The question would be whether the city lied when it said that it concluded that Wilkin had better qualifications than Runkle. So what evidence is there from which, you know, you win by saying that, that the city didn't lie when it said it concluded that Wilkin had better qualifications? As Mayor Langfelder testified in his brief that, I'm sorry, in his deposition, before he was mayor, he was treasurer and the treasurer's office essentially manages the city's program for tuition assistance for people who are attending school. So he was very much aware that she had gotten a bachelor's degree, that she had gone on beyond that and gotten her certificate in HR management, and then also that she got an MBA. He knew those qualifications that the plaintiff brings to the table is the fact that she was the assistant, the assistant purchasing manager, and the evidence has been clear that that has never been a consideration for the job. In fact, Mr. Ron, that's an argument I can imagine you making to a jury. I have trouble seeing how we can affirm summary judgment based on this comparison that a jury could also reasonably find never took place. I'm sorry, I'm not sure I understand the question. Well, I don't see how we can affirm summary judgment on the theory that Wilkins was better qualified than Runkle, where there is also evidence that that comparison never took place, and in fact that the mayor decided to hire Ms. Wilkin for this position without her even having applied for or asked for it. This is not an application position and it's hard. I understand that, but the city's defense to the before the EEOC or the Illinois Civil Rights Commission, I thought was Wilkin was better qualified. Well, she certainly is better qualified, but she is also qualified. You're completely missing the point, which is about whether the city honestly explained its reasons for the choice. Yes, the mayor explained his reasons that he was very impressed with Wilkins' work ethic and he wanted a position that would, someone in the position that would have prior experience with the utility and would be able to, since he had planned to consolidate. I understand that was the mayor's testimony. How does that fit in with the city's, how is that consistent with the city's, I'm sorry, how is that his testimony and the evidence that he chose Ms. Wilkin without her having applied and without considering plaintiff? How is that consistent with the city's defense before the EEOC or the Human Rights Commission or Civil Rights Commission that we looked at these two candidates and concluded Wilkin was better qualified? That is not our position. Our position is that Runkle was never rejected because it was a maintained a prima facie case because she is not as qualified. But what we have said all along is that the mayor was in fact focused on Wilkin and he was impressed with her position and she is, and consistently he has never picked someone from within the department or that had been the assistant. So the issue isn't whether or not directly Ms. Wilkin is more qualified and whether the city compared them. They didn't compare them, I will admit that. The fact of the matter is the more qualified person was selected and Ms. Runkle can't suggest that she was more qualified, but also that there is no evidence that race played the role here. The only reason that the issue of whether or not Ms. Runkle and Ms. Wilkin are comparable is to determine whether or not there was a racial motivation undermining the reasons that were stated that she was qualified, the mayor was impressed with her work ethic and that she brought to the table experience in both purchasing and CWLP. Mr. Ron, could I ask you to turn to the retaliation claim here? With respect to the denial of the raise that plaintiff says she had been promised, who was the decision maker to not give her that raise? That was not specifically established in the record. The mayor was not aware of when that decision was made. I would suggest the HR director with the approval of the mayor. If the mayor is involved, it sounds to me like the mayor is the decision maker. Is there any explanation that the record provides for that decision? Yes. After Ms. Runkle learned of the decision, she took what she charitably described as a long lunch. Actually, she walked off the job and only returned several hours later when co-workers said you have to come back. Once back at the office, she had a meltdown. She loudly insulted. This was documented in a memo by Ms. Metzger? No, there was no memo by Ms. Metzger. It never existed? That's correct. There was never a memo by Ms. Metzger. Isn't there? Mr. Baker, maybe you can help me out on rebuttal, but I thought there was evidence that the measures taken in response to Ms. Runkle's behavior were based on at least in part on a memo by Ms. Metzger that has never been located. No. What Mr. Kusin, the HR director, said was he thinks she may have documented it in a memo, but there was no memo. There was no memo in the file. His memory was faulty in that regard, but if you look at his testimony, he doesn't say there was a memo. He says that I believe she may have put that down in a memo. At that point, after this meltdown, she was sent home on administrative leave. Now, administrative leave is government speak for go home, sit tight, and we'll decide what to do with you. That's the disciplinary process that was started. The disciplinary process started before any charge was filed. The only reason that it was imposed after the charge was filed is because she didn't come back at the end of administrative leave. She took medical leave for work-related stress and proceeded to email all the aldermen telling them what a terrible choice the mayor had made and that her new boss was a liar. That's a pretty bold statement to take, basically moving all in with a pair of fours. If you're successful, good for you. If you're not, you have to work with this person. So, there's more than enough reason for her to be disciplined. There was more enough reason for her to be fired, and they didn't fire her. There's no evidence of retaliation because the discipline occurred, was initiated before the charge was filed. We pray that the decision be upheld. Thank you, Mr. Rahn. Thanks to both counsel. If I, I know I have a little bit of time, Judge Kenney. Oh, that's right. You have a minute and 43 seconds. Go ahead. Thank you, and I would like to respond to Judge Hamilton's questions of counsel. What was testified to was by Jim Cousin, who was the HR director, about the retaliation claim. What Jim Cousin said was it would have been the mayor who made the decision to take away her salary increase, and he said, I don't have the authority to do that, nor does the Office of Management and Budget have the authority to do that. That was Mr. Cousin's testimony. When I asked the mayor why it was done, he said, I don't know why it was done. I don't remember that. And so there has never been a real justification offered. Now, as far as Ramona Metzger, Mr. Cousin said there would have been a memo that she put together, and he said it was based on the statements that Ramona Metzger made. Now, Ramona Metzger has never been identified as a witness by the city. They have never brought her for testimony. They have never offered an affidavit, and the memo has never appeared. They say that all of these things happened after the fact, but there's no evidence whatsoever that Jim Lengfelder knew about any of those things, much less that that was the reason for him making the decision that he made. The question is, from a pretext analysis, is the statement by the city true? And there's no evidence to suggest that that's true, because when Lengfelder was asked about it, he said, yeah, I don't know why it was made. So they're trying to say we had a justification for doing this, which is fine. Just because you have a justification doesn't mean that that's the true reason why you acted, and that's the problem with the city's argument here. And so I see my time is expiring. I would ask that the court reverse the case on both grounds, on both issues, and remand the matter back to the district court for a trial. Thank you very much. Thank you, Mr. Cousin. Thanks to both counsel, and the case is taken under advisement.